# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CARLWOOD SAFETY, INC.,

       Plaintiff,

                             **CASE NO. 8:17-cv-01260-JDW-AAS**

vs.

WESCO DISTRIBUTION, INC.,
       Defendant

_____/

## PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW
## IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, CARLWOOD SAFETY, INC. ("Carlwood"), responds in opposition and files its Memorandum of Law in Opposition to the Defendant's, WESCO DISTRIBUTION, INC.'s ("Wesco") Motion for Summary Judgment (Doc. # 77)(the "Motion") as follows:

## I.    INTRODUCTION

This case invokes the secular business version of the biblical forewarning recorded by the Evangelist Matthew: *"Beware of false prophets, which come to you in sheep's clothing, but inwardly they are ravening wolves* (*Gospel of Matthew* 7:15, King James Version). Carlwood willingly entered into a partnering agreement with Wesco and Duke Energy Corporation ("Duke"), at the invitation of Duke after a late 2012 merger between Duke and Progress Energy Corporation ("Progress"). Progress was a long and trusted customer of Carlwood's, for the supply of safety and other industrial products and materials. The evidence establishes beyond dispute that Duke, Wesco and Carlwood agreed in April 2013, to partner post-merger to supply Duke with safety and industrial products as Carlwood had so successfully and trustworthily done for some 20 years for Progress. The record evidence establishes that Carlwood operated in

1

complete transparency, trust and openness for the purpose of carrying out this partnering relationship – providing anything and everything it was asked to provide to nourish the partners' business relationship. The record evidence further reveals that Wesco exploited the transparency, openness and trust of Carlwood to intentionally, deceitfully and wrongfully capture, control and completely take over the consistent historical volume of Carlwood's business with Progress -- $1 million per year – for itself.

This Response in Opposition addresses and refutes Wesco's arguments for summary judgment in the same order the arguments are presented in their Motion. The record evidentiary facts that demonstrate genuine issues of material fact exist for resolution by the fact-finder in this case are interwoven in the arguments as applicable for the purpose of space and page usage efficiency.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.' A fact is material if it may affect the outcome of the suit under the governing law.

The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine disputes of material fact that should be decided at trial. If the moving party fails to demonstrate the absence of a genuine dispute, the motion should be denied. Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial. The nonmoving party must "go beyond the pleadings," and designate specific facts showing that there is a genuine

dispute.  A mere scintilla of evidence in the form of conclusory allegations, legal conclusions, or evidence that is merely colorable or not significantly probative of a disputed fact cannot satisfy a party's burden.

The evidence presented must be viewed in the light most favorable to the nonmoving party.  If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true.  Although all justifiable inferences are to be drawn in favor of the nonmoving party, "inferences based upon speculation are not reasonable."  If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine dispute over a material fact, the court should not grant summary judgment.

*Lawrence v. Ameri-Tech Prop. Mgmt., Inc.*, Case No.: 8:12-cv-00733-T-27EAJ, at *1 (M.D. Fla. Jul. 12, 2013)(Whittemore, J.)(internal citations omitted).

## III.   <u>THIS IS NOT A TRADE SECRETS CASE</u>

The Defendant's Motion correctly states that "Plaintiff did not allege a claim for misappropriation of trade secrets under the [Florida Uniform Trade Secrets Act]." (Motion at 11) That is because this is not a trade secrets case.  The term "trade secrets" does not appear anywhere in the allegations of the Complaint. The statutory preemption of Section 688.008(1), Florida Statutes, does not, and cannot, apply to bar the Plaintiff's tort claims of Tortious Interference with Advantageous Business Relationship (Count I) or Fraud (Count III) because neither of those claims are based upon or have any connection to a misappropriation of Plaintiff's trade secrets.

In each of the decisions cited as preemption authority[1] in the Defendant's Motion, an affirmative trade secrets misappropriation claim was set forth by the Plaintiff under that jurisdiction's Uniform Trade Secret Act ("USTA") statute. There is no such conflict in this case. Carlwood has not asserted any claim under the Florida USTA, and nowhere in the Complaint does Carlwood allege that Wesco "misappropriated" any Carlwood "trade secrets" as required by the USTA. Therefore, the authorities supporting proper application of the USTA preemption provision are not applicable to this case, and cannot support the Defendant's Motion seeking to preempt and bar the Plaintiff's independent common law claims for Tortious Interference (Count I) and Fraud (Count III).

Carlwood made an intentional decision not to assert a USTA misappropriation of trade secrets claim in this case, and has not alleged, expressly or by implication, that Wesco wrongfully acquired or used any Carlwood "trade secrets" to cause harm or injury to Carlwood. The Complaint purposefully and consistently refers to "confidential information" (Compl. at ¶ 18), "most sensitive, confidential and proprietary information" (Compl. at ¶ 19a), "proprietary information" (Compl. at ¶ 19c), and "proprietary, confidential and sensitive information" (Compl. at ¶20), to define the character of information that Carlwood voluntarily exchanged with Wesco. Sensitive, proprietary and confidential information is not, by definition, "trade secret" information that is protected by the USTA. For its own reasons, Carlwood intentionally chose

---

[1] *Allegiance Healthcare Corp. v. Coleman,* 232 F. Supp 2d 1329 (S.D. Fla. 2002); *Gonzalez-Hernandez v. Orbay,* 2009 WL 10668626 (S.D. Fla. 2009); *Hauk Mfg. Co. v. Astec Industries, Inc.,* 375 F. Supp. 2d 649 (E.D. Tenn. 2004); *American Registry, LLC v. Hanaw,* 2014 WL 12606501 (M.D. Fla. 2014); *Interational Paper Co. v. Stuit,* 2012 WL 1857143 (W.D. Wash. 2012); *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.,* 780 F. Supp. 2d 1061 (D. Haw. 2011).

not to assert a USTA claim in this case.  Therefore there is no "conflicting" civil or common law claim to be preempted.

Section 688.008, Florida Statutes, states in pertinent part:

Effect on other law.—
(1)  Except as provided in subsection (2), ss. 688.001-688.009 displace **conflicting** tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret.

(2)  This act does not affect:

(a)  Contractual remedies, whether or not based upon misappropriation of a trade secret;

(b)  **Other civil remedies that are not based upon misappropriation of a trade secret**;

*Id.* (emphasis supplied)

By the plain language of the statute, only "**conflicting**" civil remedies are displaced and pre-empted by the statute, and "**other civil remedies that are not based upon misappropriation of a trade secret**" are not affected by the statute.     Wesco has not cited, and Carlwood has not been able to find any decisional law that holds a claimant must bring a UTSA trade secrets claim instead of a tortious interference claim when the factual basis involves something less than "trade secrets" as that information is defined in the UTSA. There just is no "conflicting" remedy or remedies alleged or sought in this case.  Therefore, Section 688.008, Florida Statutes, does not and cannot pre-empt and bar Carlwood's claim for Tortious Interference With and Advantageous Business Relationship or Fraud. The Court should and must deny Wesco's Motion on this argument.

5

## IV.   WESCO REPEATEDLY ASSURED CARLWOOD THAT BUSINESS ORDERS WOULD BUILD TO HISTORICAL VOLUMES

The long and consistent business relationship that Carlwood had with Progress is not, and cannot be, disputed by Wesco's Motion. Under the ownership of Martha and Larry Wilson, Carlwood had been a trusted supplier of Progress and its predecessor entities since at least 1989 (Ex. A; Larry Wilson Depo Transcript at pg. 11, lns. 8-20)( Ex. A; Larry Wilson Depo Transcript at pgs. 14-17), and by 2011 and 2012, Carlwood was doing in excess of $1 million per year in business with Progress (Ex. B; Duke Energy Corp. Summary of Carlwood Safety Business Volume).  In September 2010, Progress awarded Carlwood a three (3) year blanket purchase order ("BPO") to be the preferred Progress supplier of safety products and other materials from September 2010 through September 2013. (Ex. C; Jerome Boise Depo Tr. at pgs. 104 – 106 and Exs. 11 and 12).

On July 3, 2012, while the Progress BPO with Carlwood remained fully active, Progress merged with Duke Energy Corporation.  (Ex. A to Complaint)  In a letter to all of their suppliers and service providers, Duke Energy stated explicitly that:

> "All existing purchase orders and contracts . . . will be unaffected by the merger. The great majority of purchase orders and contracts issued previously by Duke Energy, Progress Energy, and their respective subsidiaries do not require an amendment or re-assignment . . . . You should continue to work with your current point of contact o0n contractual agreements, outstanding purchase orders, invoice payments or other procurement activities you are conducting with Duke Energy or Progress Energy until you have been notified otherwise.

(Ex. A to Complaint)

In 2012, Carlwood did $1,015,463.00 in business with Progress/Duke Energy Corporation. (Ex B; Duke Energy Corp Business Volume Summary)

In December 2012, Carlwood, Wesco and Duke employees met for the first time at the Duke facility in Wildwood, Florida.

> Q.  (Mr. Gorcyca) Barbara Marino.·  Okay.·  And did she stay with company after the merger and become, then, a Duke employee?
>
> A·(Mr. Boies)  I believe she's still there.
>
> Q·  Okay.·  Still there today?
>
> A·  As far as I know, yeah.
>
> Q·  · So she was your -- is that the right word to use, "point person"?
>
> A·  She was.·  When we went to Wildwood in December of 2012, we had a meeting with Barbara.·  It was myself, Larry Wilson, Kurt Urban, from WESCO, and Mike Rumer from WESCO was our initial meeting, where they discussed how much money they had allocated under the integrated contract and what they were going to retain us for, the diversity spend. · · · · · They had $30 million allocated for the 20 percent that was required for the minority spend and it wouldn't be a problem to meet the million dollars that we were annually doing. So that was our initial, was set up through Barbara Marino.

(Ex. C; Jerome Boies Depo Tr. at pg. 95,ln. 4 through pg. 96, ln. 5)

On April 25, 2013, Wesco, Duke and Carlwood conducted a meeting at Carlwood's offices in Pinellas Park, Florida. ( Ex.C; Jerome Boies Depo Tr. at Ex. 15).  The purpose of this meeting was for the former Progress procurement employees, then Duke procurement employees post-merger, to introduce Wesco employees to Carlwood and to discuss Wesco's and Carlwood's roles and business relationships with Duke (Id.)  At that meeting, Scott Dowell from Wesco agreed to partner with Carlwood going forward to meet Duke's purchasing and business needs.

> Q.·(Mr. Gorcyca) ·When was this partnership agreement reached? · ·
>
> A.·(Mr. Wilson) ·April 2013. · ·
>
> Q.· ·At a meeting on April 25th, 2013? · ·
>
> A.· ·Correct. · ·

Q.·  ·Was that -- who was there for WESCO? · ·

A.·  ·Geez.·  There was several people.·  The main guy there was Scott Dowell.·  He was the man in charge.·  And he's the one that stood up, shook my hand and looked me in the eye and said, we want to partner with you, your business will not change, and you have the opportunity to grow. · · · · ·You can quote me on that. ·

Q.·  ·Was it your intent when you made that agreement with Mr. McDowell, I think you said his name was, was it your intent that that would be for an indefinite period of time? · ·

A.·  ·Correct.

(Ex. A; Larry Wilson Depo Tr. at pg 64, lns. 6-22)

Q. (Mr. Gorcyca)  The statement that was made was, we want to partner with you, correct? · ·

A. (Mr. Wilson) Yes. · ·

Q.·  ·And as far as you understood, there was an agreement made orally at that time to partner indefinitely into the future, correct? · ·

A.·  ·Correct. · ·

Q.·  ·So my question is what steps or efforts were taken by Carlwood Safety when it submitted what it says is proprietary information to WESCO in response to RFQs? What was done by Carlwood Safety to ensure the confidentiality of that information? ·

A.·  ·Based on the agreement that was made in the April meeting, we then received this dossier lengthy RFQ, which is out of the norm, related to the form that it was in.·  Never have we ever responded to an RFQ that required you to release your cost, your profitability, your vendor.·  And it was on that.·  And we weren't concerned about the confidentiality we assumed was going to transpire and take place based on the agreement that we made.·  And I considered that verbal agreement binding.

(Ex. A;. Larry Wilson Depo Tr at pg 67, lns. 1-22)

Q. (Mr. Gorcyca) Tell me what you recall about the meeting as you sit here today. · ·

A. (Mr. Wilson) As I mentioned, the purpose of the meeting was Duke and WESCO together to come to Carlwood Safety to say we are going to retain you as a supplier, you're going to be partnering with WESCO.· And that's what transpired.· And how the communications will flow. I can't remember the guy's name that was -- geez.

Q.· When you say how the communications –

A.· Would transpire between WESCO and Carlwood.

Q.· Do you recall what you were told about how they would transpire?

A.· Yes.· Scott McDowell [sic] said that Penal (phonetic) or whatever his name was -- it was his second in command -- would provide all the data as far as requirements, locations of releases.· And it was an understanding at that time because of our location and our density within the Progress Energy/Duke organization that we supplied everything in Florida.

Q.· Okay.

A.· We had all those locations.

Q.· So you –

A.· And it was understood, not etched in stone or documented, that we would continue doing what we were doing.

Q.· Was it stated that you would continue to provide everything in Florida?

A.· Yes.

Q.· By who?

A.· By WESCO. They said, nothing is going to change.

Q.· ·That's a different question.

A.· ·How is that a different question?

Q.· ·Let me back up.· Did anyone from WESCO say you're -- Carlwood Safety is going to continue to provide everything in Florida?

A.· ·Everything that we were supplying in the past, yes.

Q.· ·That's what the exact words were?

A.· ·Yes.

9

Q.· ·Or did they say nothing is going to change?

A.· ·They said both.

(Ex. A, Larry Wilson Depo Tr. at pg. 72, ln. 9 through pg.73, ln. 25)

At the outset of the introduction of Wesco to Carlwood by Duke procurement employees, Carlwood was told expressly by Wesco that Wesco was going to "**partner**" with Carlwood to continue Carlwood's historical level of business volume with Progress pre-merger, and to perhaps even grow the business volume going forward indefinitely.  Throughout the business relationship between Carlwood, Wesco and Duke, Wesco continued to assure Carlwood that Wesco was working to find business volume and place orders with Carlwood to build and sustain those historical revenue levels of a million dollars annually.

In late February 2014, Wesco delivered a Request for Quotation to Carlwood for the items that Duke and Wesco had identified for Carlwood to be a supplier. (Ex. C; Jerome Boies Depo Tr. at pgs. 137 – 139). Wesco "dictated" to Carlwood what the prices, profit margins and freight cost allowance were to be for Carlwood. (*Id.* at pg. 138, ln. 13 through pg. 139, lm. 18). "It was specific to ensure [Carlwood's] participation and fit the program based on Wesco dictated pricing and margins." (*Id.* at pg. 139, lns. 8-10).

Almost a year to the day after the April 25, 2013, meeting that set out the "**partnering**" relationship between Wesco and Carlwood to supply Duke's needs, Wesco assured Carlwood that Wesco was "trying to find additional dollars for [the Carlwood] contract." (Ex. D; Patrick Penuel e-mail dated April 24, 2014).

Carlwood admits that there was no written contract between Carlwood and Wesco.  That is why Carlwood did not set forth a claim for Tortious Interference With Contract.  The claim that Carlwood asserted in this case is Tortious Interference With a Business Relationship.

"[A]n action for intentional interference with a business relationship or expectancy will lie if the parties' understanding would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor*, 647 So. 2d 812, 815 (Fla. 1995)(citing *Charles Wallace Co. v. Alternative Copier Concepts, Inc.*, 583 So.2d 396, 397 (Fla. 2d DCA 1991))

> In contrast to a claim for tortious interference with a contract, a business relationship "need not be evidenced by an enforceable contract. However, the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights. In particular, it must be 'evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered.'

*Centennial Bank v. Servisfirst Bank Inc.*, Case No: 8:16-cv-88-T-36JSS, at *6 (M.D. Fla. Oct. 14, 2016)(internal citations omitted)

The evidence in this case demonstrates beyond dispute that Carlwood had a long existing business relationship with Progress leading into the merger with Duke in 2012, and, in fact, had an existing BPO agreement with Progress effective through September 2013 that Duke expressly confirmed would be unaffected and unchanged. (Ex. A to Complaint) The evidence further demonstrates that beyond the existing BPO agreement, Wesco expressly assured Carlwood that it would "partner" with Carlwood to supply Duke's safety and MRO materials needs at or better than historical business levels prior to the merger. The evidence demonstrates that Carlwood had "an actual and identifiable understanding or agreement [to supply materials to Duke] which in all probability would have been completed if [Wesco] had not interfered.

## V.   WESCO INTENTIONALLY AND WRONGFULLY INTERFERED TO CONTROL AND CAPTURE THE PLACEMENT OF ORDERS TO ITSELF

Shortly after the April 25, 2013, meeting with Wesco and Duke at Carlwood's facility, it became apparent that Wesco was taking internal actions to redirect Duke's material order placements to itself. In late June 2013, two (2) months after the April 2013 meeting, Carlwood was informed by one of their supplier sources that Wecso had instructed the supplier, Estex, not

to provide quotes for items to Carlwood. (Exhibit E; Wilson e-mail string with Dowell dated June 25, 2013).

In July 2013, Carlwood was informed by Wesco that "ALL" of the items that Carlwood had supplied to the Progress power generation sites were being pulled from Carlwood and would be supplied to Duke power generation by Wesco. (Ex. F; Boies e-mail to Sherrie Duncan dated September 20, 2013). When Carlwood confronted Wesco about this decision, Wesco's Rick Hargrave retorted: "Then I lied to you and Larry [Wilson] in that meeting." (*Id.*) It is important to remember that these particular actions were being taken during the time that Carlwood's pre-existing BPO with Progress Energy, valid through September 2013, was in full force and effect, and that Duke had expressly assured Carlwood that existing agreements would be honored.

Almost a day to the year after the April 25, 2013 "partnership" meeting, Wesco was making internal buying decisions that rejected Carlwood as a supplier for Duke's safety material needs on items that Carlwood had historically supplied to Progress, and that Carlwood had been the approved and preferred source for Progress. (Ex. G; Karen Dodd e-mail to Patrick Penuel dated April 24, 2014)

In August 2014, Wesco was directing its personnel not to buy anything from Carlwood. (Ex. H; Cabot Goodrum e-mail to Karen Dodd dated August 20, 2014)(Ex. J; Cabot Goodrum e-mail to Russ Reynolds dated August 20, 2014).

Wesco internal buyers were asking Carlwood for pricing and product information with the intention and for the sole purpose of identifying manufacturers of products that Carlwood had long supplied to Progress so that Wesco could then go directly to that manufacturer to purchase the product and cut out Carlwood from the supply chain. ((Ex. K; Jordan Cassidy e-mail to Rick Hargrave dated October 31, 2014).

Wesco's internal communications plainly demonstrate that Wesco was acting only and purposely to benefit itself, and in contravention of the "partnering" agreement that had been reached at the April 25, 2013, meeting between Carlwood, Duke and Wesco at the outset of Duke's merger with Progress.   Wesco's primary argument and basis for seeking a summary judgment is to blame Duke for the implosion and failure of the "partnering" agreement. This argument is completely betrayed by Wesco's own internal communications.

On November 12, 2014, Patrick Penuel, Wesco' s point man for the Power Transmission and Delivery integrated supply chain, e-mailed his team and stated the following:

> Duke is asking a ton of questions about Carlwood as Carlwood is in financial straits and may have to shut down business . . . .When I checked the list I noticed there were 74 items with Carlwood as the supplier.   The other attachment has the 200 items that Carlwood is authorized to supply.   I am thinking that many of the items haven't been "converted" to Carlwood since we have old stock on hand or buyback stock. If there is another reason then I think we are going to have to answer for it. I wanted you to be able to review your information prior to be [sic] put on the spot if we get called into Executive session next week.

(Ex. L; Pat Penuel e-mail to Karen Dodd and others dated November 21, 2014)

If, as Wesco so adamantly asserts in its Motion, the failure to purchase materials from Carlwood was that Duke "refused to place any orders and chose not to move that relationship forward," (Motion at 14-15) why would Duke be asking "a ton of questions about Carlwood"? Why would Duke be putting anyone at Wesco "on the spot" if it is was Duke that was actually preventing Wesco from purchasing materials from Carlwood? This internal communication expressly states that Carlwood has been "approved" to supply some 274 items to Duke, yet Wesco lays all the blame for Carlwood's business demise on Duke's refusal to approve any purchases from Carlwood. The documentary evidence establishes that Wesco was methodically and surreptitiously working to eliminate Carlwood from supplying anything to Duke.  Wesco has

not produced a single document that corroborates or verifies its assertion that Wesco was doing everything it could to get Duke to approve orders to Carlwood, nor a single document demonstrating that Duke prevented, much less prohibited any such approvals or purchases.

These Wesco internal communications are but a sampling of the most candid and blunt communications that were taking place inside of Wesco while the Carlwood business volume was being intentionally and wrongfully captured and devoured by Wesco, for the exclusive benefit of Wesco, and all without the knowledge or intention of Duke and Carlwood. Wesco's narrative and arguments completely ignore the demonstrated record evidence that Wesco was internally doing everything it could to take control over and capture the Duke business that Carlwood had so long and successfully provided to Progress. This record evidence demonstrates that it was Wesco – not Duke -- that was preventing any purchases from Carlwood despite Duke's approval of over 200 items supplied by Carlwood before Wesco entered the relationship. The record evidence reveals that internally, Wesco was directing that "nothing" be purchased from Carlwood. The record evidence demonstrates that Wesco was only using Carlwood as a library of supply sources and item descriptions to buy directly from the sources that Carlwood had willingly and cooperatively shared with their "partner."

Wesco intentionally and wrongfully interfered in the business relationship between Carlwood and Duke by methodically giving directions and taking actions to capture, control, and take over the supply of materials that Carlwood had developed a long and reputable history of supplying to Progress, and that Duke had assured would continue at or near historical business volumes of $1 million dollars per year. Based on the unquestionable existence of disputed material facts in this case, the Court should and must deny Wesco's Motion.

14

## VI.   THE PRIVILEGE TO INTERFERE IS NOT ABSOLUTE

Paradoxically, after boldly asserting that there was no enforceable business relationship to be interfered with (Motion at 14), Wesco then argues that it cannot be liable for interference because they were not a stranger to the "crucial business relationships at issue in this case" — they had "a supervisory interest in how the relationship be6tween Duke and Carlwood was conducted." (Motion at 15). This argument fails because Wesco ignores a well and long established exception to the privilege of interested parties to wrongfully interfere in a business relationship.

> The privilege to interfere may be eliminated when an act is undertaken out of pure malice or if improper methods were used.
>
> Malice may be shown indirectly "by proving a series of acts which, in their context or in light of the totality of the circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will or other bad motive. In examining what constitutes improper methods, Florida Courts have stated: In those circumstances in which there is a qualified privilege to interfere with a business relationship, the privilege carries with it the obligation to employ means that are not improper. In other words, the privilege does not encompass the purposeful causing of a breach of contract. The justification for intentional interference depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important.

*Hush Little Baby, LLC v. Chapman*, CASE NO. 8:13-CV-2027-T-17AEP, at *16 (M.D. Fla. Dec. 16, 2015)(internal citations omitted)

The record evidence discussed in Section V, *supra*, demonstrates that disputed issues of material fact remain in this case regarding whether Wesco's conduct was malicious, self-serving, and/or contrary to the interests of its principal, Duke Energy. "It is for the trier of fact to determine whether at the time the [interference occurred] it was for the furtherance of

15

the corporation's interests or for [the Defendant's own] interests with no benefit to the [principal]." *O.E. Smith's Sons, Inc. v. George*, 545 So. 2d 298, 300 (Fla. Dist. Ct. App. 1989). "Where the circumstances surrounding the statement are in dispute, the question of qualified privilege is a factual determination for resolution by the jury." *Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1114 (M.D. Fla. 2019)(citing *McCurdy v. Collis*, 508 So. 2d 380, 383 (Fla. 1st DCA 1987)).

Moreover, Wesco failed to plead any such privilege of an interested party to interfere as an affirmative defense. Florida courts consider the privilege to interfere as an affirmative defense for claims of tortious interference with contractual relationships. *Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F.Supp.2d 1093, 1104 (S.D. Fla. 2000) (citing *Abele v. Sawyer*, 750 So.2d 70, 75 (Fla. 4th DCA 1999) ). As a result, "Florida courts have discussed this defense within a burden-shifting framework. That is, once a plaintiff has made a prima facie case of tortious interference with a business relationship, the burden shifts to the defendant to show that his interference was lawful.".

*Diamond Resorts Int'l, Inc. v. Aaronson*, 371 F. Supp. 3d 1088, 1114 n.24 (M.D. Fla. 2019)

## VII.   WESCO'S EXPRESS AGREEMENT TO PARTNER WITH CARLWOOD WAS A SHAM

Wesco does not and cannot dispute that on April 25, 2013, in the presence of Duke and with Duke's urging and insistence, Wesco agreed to "partner" with Carlwood to satisfy Duke's safety and industrial product materials needs post-merger with Progress E. (Ex. A; Larry Wilson Depo Tr. at pg 64, lns. 6-22) (Ex. A, Larry Wilson Depo Tr. at pg. 72, ln. 9 through pg.73, ln. 25). That agreement was a statement of definite present intention, not some optimistic, hopeful promise of future conduct or outcomes. Carlwood understood and accepted that statement in its plain and clear meaning – that Wesco was to be trusted to work for the mutual benefit of the

partners Duke and Carlwood. (Ex. A; Depo Tr. Larry Wilson at pg 67, lns. 1-22). There is ample record evidence in this case to establish that Wesco intentionally and deceitfully betrayed that trust and agreement to capture for itself the substantial business volume that Carlwood had historically supplied to Progress and was directly and expressly led to believe would continue with Duke.

The record evidence set out and discussed in Sections IV and V, *supra,* demonstrates that: (1) a commitment to "partner" between Wesco, Duke and Carlwood was made on April 25, 2013; (2) within two (2) months after that commitment Wesco was taking internal action to prevent manufacturers from providing pricing and information to Carlwood; (3) within three (3) months Wesco removed from Carlwood's existing and valid BPO, all of the safety and industrial items it was and had been supplying to the Power Generation sites in Florida and took all of that business for itself; (4) by August 2014 Wesco was internally directing that "nothing" be purchased from Carlwood; and (5) internally Wesco buyers were asking Carlwood for product and pricing information for the sole purpose of identifying approved sources and then buying directly from Carlwood's sources of products.

This record evidence creates genuine issues of disputed material fact that are properly left for the fact-finder to consider and weigh in deciding this case. "If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true." *Lawrence v. Ameri-Tech Prop. Mgmt., Inc.*, Case No.: 8:12-cv-00733-T-27EAJ, at *1.

Based upon the record evidence, a reasonable fact-finder could find that that Wesco, despite its explanation that it was Duke who prevented Carlwood from participating in the "partner" relationship, that it was Wesco' purposeful and intentionally deceitful actions that led to the utter destruction of Carlwood's long and successful history as a supplier to Progress and its

17

successor Duke. Therefore, this Court should and must deny Wesco's Motion for Summary Judgment.

**VIII.**       **CONCLUSION**

For all of the foregoing reasons, the Plaintiff, CARLWOOD SAFETY, INC., respectfully prays the Court will properly deny the Defendant's Motion for Summary Judgment.

Respectfully submitted,


_____/S/  Charles W. Gerdes_____
CHARLES W. GERDES
Fla. Bar No. 00288380
charlie@gerdeslegal.com
Keane, Reese, Vesely & Gerdes, P.A.
111 2nd Avenue NE
Suite 703
St. Petersburg, FL 33701
(727) 823-5000
(727) 894-1023 (FACSIMILE)
louanne@gerdeslaw.com
**Attorneys for Plaintiff**
**Carlwood Safety, Inc.**


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 11, 2019, I caused a true and correct copy of the foregoing Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment to be delivered by e-mail to Jeffrey T. Gorcyca, Esq., Bowman & Brooke, LLP, by e-mail to Jeffrey.Gorcyca@bowmanandbrooke.com

_____/S/  Charles W. Gerdes_____
CHARLES W. GERDES

18