UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**CARLWOOD SAFETY, INC.,**

    **Plaintiff,**

v.                                          Case No: 8:17-cv-1260-T-27AAS

**WESCO DISTRIBUTION, INC.,**

    **Defendant.**
_____/

## ORDER

**BEFORE THE COURT** is Defendant Wesco Distribution, Inc.'s Motion for Summary Judgment (Dkt. 77), Plaintiff Carlwood Safety, Inc.'s Response (Dkt. 87), and Wesco's Reply (Dkt. 90). Upon consideration, Wesco's motion is **GRANTED**.

### Carlwood's Claims

Carlwood brought three claims against Wesco in state court: tortious interference with a business relationship (Count I); violation of the Florida Deceptive and Unfair Trade Practices Act (Count II); and fraud (Count III). (Dkt. 2). The case was removed to federal court based on diversity jurisdiction, and the parties stipulated to the dismissal of Count II. (Dkts. 1, 74). Wesco moves for summary judgment on the remaining counts, arguing they are preempted by the Florida Uniform Trade Secrets Act (FUTSA) and alternatively, the undisputed evidence cannot establish a *prima facie* case on either count. (Dkt. 77).

**I.    BACKGROUND AND UNDISPUTED FACTS**

Carlwood Safety, Inc. is a supplier of safety, industrial, and janitorial supplies and tools. (Dkt. 2 ¶ 7). Carlwood supplied products to Progress Energy, Inc. and its predecessor entities since

1

at least 1989, which constituted the majority of Carlwood's business. (Dkt. 87-1, Larry Wilson Dep. at pp. 14-16). As a preferred vendor for Progress Energy, Carlwood was party to a series of blanket purchase orders through which Progress Energy ordered products as necessary. (Dkt. 2 ¶ 8; Dkt. 87-3, Jerome Boies Dep. at pp. 104-05; Dkt. 87-2 at 2). One such blanket purchase order was in effect from September 2010 to September 2013. (Dkt. 87-3, Boies Dep. at p. 105).

In 2011, Duke Energy Corporation announced its planned acquisition of Progress Energy, effective July 3, 2012. (Dkt. 2 ¶ 11; Dkt. 2-1). In a letter to its suppliers and service providers, Duke stated:

> All existing purchase orders and contracts . . . will be unaffected by the merger. The great majority of purchase orders and contracts issued previously by Duke Energy, Progress Energy, and their respective subsidiaries do not require an amendment or re-assignment. . . . You should continue to work with your current point of contact on contractual agreements, outstanding purchase orders, invoice payments or other procurement activities you are conducting with Duke Energy or Progress Energy until you are notified otherwise.

(Dkt. 2-1).

Also in 2012, Duke sent an open bid to "everybody that was already a supplier and could be a supplier" to determine which entity would be responsible for integrating and managing Duke's company-wide supply chain as its supply "integrator." (Dkt. 77-1, Scott Dowell Dep. at pp. 21, 38). Wesco Distribution, Inc. bid on and won the contract. (Id. at 37-38). As a result, Wesco became Duke's supply integrator and sold products to Duke as a distributor. (Id. at 50).

After Wesco became Duke's supply integrator, Duke approved the suppliers from whom WESCO was authorized to purchase products. (Dkt. 77-1, Patrick Penuel Dep. at pp. 30-31). Wesco could purchase items from suppliers if Duke authorized the supplier and issued a blanket

purchase order identifying the acceptable scope and price of supplies. (Dkt. 77-1, Dowell Dep. at pp. 59-60, 88).[1]

During the negotiations between Duke and Wesco, Duke advised Wesco that it wanted to maintain relationships with several diversity suppliers, including Carlwood, with which it had "been in the public eye" the past year "at events or with some sort of recognition." (Id. at 47). Wesco's Scott Dowell recommended that Duke and Wesco "put in the contract, that commitment. . . . Let's say as part of this diversity commitment, it will be these four suppliers, and we will identify . . . how much revenue you want us to carve off . . ." (Id. at 47-48). Duke rejected this proposal, however, as Duke's representative "didn't want to call [the suppliers] out in the contract." (Id. at 48).[2]

---

[1] As Wesco's generation alliance manager, Scott Dowell, explains,

> Wesco is performing two roles. We are performing a role as a distributor, where we are selling the products that we have been awarded as part of that contract as a distributor, and there's pricing associated with all that, and mark-up structures and everything that we've agreed to in that contract of anything we sell to them as a distributor . . . .
>
> Everything else that's outside that scope . . . that we are responsible to manage, we manage as an integrator. And so all of those transactions flow through an integrator system . . . .

(Dkt. 77-1, Dowell Dep. at p. 50). In other words, Wesco was "managing suppliers that Duke has selected" and "pulling [them] into this integrated supply chain." (Id. at 52).

Without Wesco's knowledge, someone at Duke removed the blanket purchase order on file for Carlwood. (Dkt. 77-1, Dowell Dep. at p. 77). The information was "converted" to the "new Wesco price in the Duke system." (Id.). Wesco followed up on the matter with Duke, but "never got an answer." (Id. at 78).

[2] In December 2012, Carlwood's owner, Larry Wilson, and Jerome Boies, Carlwood's operations manager, met with representatives of Wesco and Duke to discuss "how much money they had allocated under the integrated contract and what they were going to retain [Carlwood] for, the diversity spend. They had $30 million allocated for the 20 percent that was required for the minority spend and it wouldn't be a problem to meet the million dollars that [Carlwood was] annually doing." (Dkt. 87-3, Boies Dep. at p. 95). The Duke representative at the meeting, Barbara Marino, a former Progress Energy procurement specialist, had communicated with Carlwood about the 2010-2013 blanket purchase order. (Id. at 105-06; Dkt. 87-3 at 13-14).

3

A meeting was scheduled on April 25, 2013 to introduce Wesco to Carlwood as Duke's supply integrator. (Dkt. 2 ¶ 13; Dkt. 87-3 at 24). The meeting was designed to, among other things, "develop a relationship so that [Wesco] could do what Duke asked [it] to, which was . . . find a way to keep [Carlwood] engaged doing business with Duke Energy." (Dkt. 77-1, Dowell Dep. at p. 71). According to Wilson, Dowell told him during the meeting that "we want to partner with you, your business will not change, and you have the opportunity to grow." (Dkt. 87-1, Wilson Dep. at pp. 64, 72-73). Wilson believed this statement constituted a binding oral agreement to partner indefinitely into the future. (Id. at 67). Dowell does not remember making the statement, although he acknowledges that the meeting was positive and that there was a "clear way" for Wesco to proceed. (Dkt. 77-1, Dowell Dep. at pp. 103-04).[3]

In June 2013, Carlwood was informed by Estex, one of its supply sources, that Wesco had instructed it not to quote items for Carlwood. (Dkt. 87-5 at 2). In response to Carlwood's inquiry into this, Dowell told Wilson he was unaware of the matter, asked for details, and said he would look into it. (Id. at 3). The next month, Wesco informed Carlwood that items it had supplied to Progress Energy's power generation sites would be "pulled from [Carlwood's] blanket purchase order," including items that Duke instructed Wesco to remove. (Dkt. 87-6). In response to Carlwood confronting Wesco about this decision, a Wesco representative said, "Then I lied to [Boies] and Larry [Wilson] in that meeting." (Id. at 2).

---

[3] There was never a written agreement between Wesco and Carlwood. (Dkt. 87-1, Wilson Dep. at p. 64; Dkt. 77-1, Boies Dep. at p. 326). Dowell's purported promise is immaterial to Carlwood's tortious interference claim, since it was made by a representative of Wesco, not Duke, and therefore did not directly relate to Carlwood's relationship with Duke. Moreover, contrary to Wilson's belief, the promise was insufficient to constitute a binding agreement. *See Bergman v. DeIulio*, 826 So. 2d 500, 503 (Fla. 4th DCA 2002) (citations omitted) ("To be enforceable, an agreement must be sufficiently specific, and reflect assent by the parties to all essential terms. . . . Where essential terms of an agreement remain open, subject to future negotiation, there can be no enforceable contract."). In any event, Carlwood does not assert a breach of contact claim.

In February 2014, Wesco sent Carlwood a request for quotation (RFQ) for items identified by Duke and Wesco for Carlwood to supply. (Dkt. 87-3, Boies Dep. at p. 137). Duke had to approve the item and its manufacturer, and the pricing and profit margins had to reach the level dictated by Duke as conveyed to Carlwood by Wesco. (Id. at pp. 138-39; Dkt. 77-1, Penuel Dep. at 79). Boies explained: "[Wesco] told us specifically the number. Basically, they could have filled out the RFQ for us, because they were telling us 'Here's what the price has to be.' And so we filled it out exactly how they said, yes." (Dkt. 87-3, Boies Dep. at p. 139). Prior to this, Carlwood had never responded to an RFQ that required it to release its cost, profitability, and vendor information, and was not "concerned about the confidentiality [it] assumed was going to transpire and take place based on the agreement [it] had made." (Dkt. 87-1, Wilson Dep. at p. 67). Significantly, the RFQ expressly provided that inclusion of the quantities of certain items were not guarantees of future business. (Dkt. 87-3 at 20).

Penuel testified that when Carlwood asked whether Wesco would order supplies based on the RFQ, Wesco "would tell them that [it was] in the process of getting approvals from Duke, because that's what [it] believed to be true." (Dkt. 77-1, Penuel Dep. at p. 120). He also directed Carlwood to contact Ric Skinner, a Duke representative who "would do the phone calls, and then he would take the scenario to a team or to the Supplier Relations people, and they would decide if they're willing to do that." (Id. at 108, 119-20).[4]

---

[4] According to Penuel, Wesco attempted to engage Carlwood in supplying Duke but was unsuccessful because Duke "did not approve the execution" and "said no to all of those scenarios." (Dkt. 77-1, Penuel Dep. at pp. 63, 114). Internal Wesco communications, however, suggest that Wesco did not purchase some items from Carlwood due to other reasons, such as poor customer service or because Wesco already stocked the item. (Dkt. 87-7 at 2; Dkt. 87-10). Penuel also testified that Duke was complaining about higher costs, although it is unclear whether such costs were due to additional markup from Wesco. (Dkt. 77-1, Penuel Dep. at pp. 108, 114); *see also* (Dkt. 77-1, Dowell Dep. at p. 80).

In April 2014, Wesco provided Duke hard hat liners that were not ordered through Carlwood. (Dkt. 87-7).[5] In the same month, one of Wesco's employees and points of contact for Carlwood, Patrick Penuel, told Carlwood that Wesco was "trying to find additional dollars for [Carlwood's] contract and work out details on the minimums with Duke." (Dkt. 87-4 at 2). In August 2014, a Wesco employee directed other employees not to purchase items from Carlwood. (Dkts. 87-8, 87-9). And at least one Wesco employee ordered products from Carlwood to obtain the product's manufacturer and part number, so Wesco could purchase the product directly from the manufacturer. (Dkt. 87-10).

In September 2014, Duke's managing director of its supply chain strategy team told Carlwood that Duke is "unable to make a specific volume commitment[] due to the variability of demand for [Carlwood's] products. These projections should serve only for planning purposes and not be considered promised or committed revenues." (Dkt. 90-1 at 4). Duke's spending on products supplied by Carlwood declined each year from 2012 to 2015. *See* (Dkt. 87-2 at 3).

In November 2014, Penuel told his team by email:

> Duke is asking a ton of questions about Carlwood as Carlwood is in financial straits and may have to shut down business. . . . When I checked the list I noticed there were 74 items with Carlwood as the supplier. The other attachment has the 200 items that Carlwood is authorized to supply. I am thinking that many of the items haven't been "converted" to Carlwood since we have old stock on hand or buyback stock. If there is another reason then I think we are going to have to answer for it. I wanted you to be able

---

To the extent this presents a factual dispute, the dispute is not material since, even assuming that Wesco instructed its employees not to purchase products from Carlwood and the deletion of the blanket purchase order did not present an obstacle to purchasing from Carlwood, the record evidence does not support a tortious interference of business relationship or fraud claim.

[5] An employee explained that Wesco "stock[ed] these for Fossil also and they have been using for months. Fossil does not want [Wesco] to use Carlwood and they will not pay a higher cost if [Wesco's] inventory is from Carlwood. The way I understand it, these liners are a hot rush with the expectation that material is available for [April] 28th." (Dkt. 87-7 at 2-3).

> to review your information prior to be put on the spot if we get called into Executive session next week.

(Dkt. 87-11).

Duke ultimately informed Wesco that it would not "be part of this process anymore, so it's up to Wesco to do whatever you want to do. If you want to continue to work with Carlwood or try to work with Carlwood, that is up to you, but Duke is out of the process." (Dkt. 77-1, Dowell Dep. at p. 97).

**II. STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials on file, that there are no genuine disputes of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant adequately supports its motion, the burden shifts to the nonmoving party to show specific facts that raise a genuine issue for trial. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). The evidence presented must be viewed in the light most favorable to the nonmoving party. *Ross v. Jefferson Cty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012). "Although all justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin*

*Cty. v. Purcell Corp.*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable," *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986).

## III. DISCUSSION

In summary, Carlwood's claims are not preempted by FUTSA. However, the evidence does not establish a *prima facie* claim of tortious interference with a business relationship or fraud. Accordingly, based on the undisputed material facts, and there being no genuine dispute of material fact, summary judgment in Wesco's favor is appropriate as a matter of law on both claims.

*Preemption*

Wesco's contention that FUTSA preempts Carlwood's claims is without merit. FUTSA "displace[s] conflicting tort, restitutory, and other law of [Florida] providing civil remedies for misappropriation of a trade secret." Fla. Stat. § 688.008(1). The statute does not affect "other civil remedies that are not based on misappropriation of a trade secret." Fla. Stat. § 688.008(2)(b). "[T]he issue becomes whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by §688.008." *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329, 1335-36 (S.D. Fla. 2002) (citations omitted).

Wesco argues that because Carlwood "cannot prevail on the tortious interference with business relationship and fraud claims without proving misappropriation of trade secrets, those claims are preempted as matter of law and must be dismissed." (Dkt. 77 at 13). Carlwood maintains that it did not bring a trade secrets misappropriation claim, that the misappropriated information does not constitute a trade secret, and that, unlike here, the plaintiffs in the cases Wesco relies on brought claims under various Uniform Trade Secrets Acts. (Dkt. 87 at 4-5).

In its Reply, Wesco contends that misappropriated information need not constitute a trade secret for purposes of FUTSA preemption. (Dkt. 90 at 1). However, the reasoning of the cases on

8

which Wesco relies is not persuasive here, since those cases included a statutory misappropriation of trade secrets claim, and Carlwood contends that the confidential, proprietary information Wesco appropriated was not a trade secret.[6]

Rather, Wesco's contention that preemption is appropriate even if the misappropriated information falls short of a trade secret is contrary to the express language of the statute, which does not affect "other civil remedies that are not based on misappropriation of a trade secret." Fla. Stat. § 688.008(2)(b). Accordingly, because Carlwood's claims are not based on the misappropriation of a trade secret, they are not preempted by FUTSA.

*The Merits of Tortious Interference with a Business Relationship*

Although not preempted, Carlwood's tortious interference with a business relationship claim is not supported by the evidence, and there is no genuine dispute of material fact to preclude summary judgment.

Under Florida law, the elements of a claim of tortious interference with a business relationship are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of that interference." *Palm Beach Cty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009) (citation omitted).

---

[6] "To qualify as a trade secret, the information that the plaintiff seeks to protect must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *See Am. Registry, LLC v. Hanaw*, No. 2:13-CV-352-FTM-29CM, 2014 WL 12606501, at *3 (M.D. Fla. July 16, 2014) (citations omitted). Although Carlwood's pricing and vendor information likely does constitute a trade secret, this presents a factual question that the parties did not brief. The Court declines to engage in factfinding to make this determination.

Wesco contends that summary judgment is appropriate because there was no business relationship between Carlwood and Duke under which Carlwood had legal rights or evidence of intentional and unjustified interference by Wesco with such a relationship. Carlwood counters that the blanket purchase order and Duke's assurances of continued business provided it with legal rights, and that Wesco intentionally and unjustifiably interfered with its relationship with Duke by not purchasing supplies on Duke's behalf from Carlwood. Based on the undisputed evidence, Carlwood's contentions are not supported and therefore without merit.

I. Existence of a Business Relationship Under Which Carlwood Has Legal Rights

"A business relationship need not be evidenced by a contract, but it generally requires an understanding between the parties that would have been completed had the defendant not interfered." *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (internal quotation marks, citations, and brackets omitted); *see also Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) ("As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."). Such a relationship might exist, for example, where there is ongoing business between identifiable parties, even in the absence of an obligation to continue the relationship. *See Int'l Sales & Serv., Inc.*, 647 So. 2d at 1156; *see also Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F. Supp. 3d 1292, 1301 (M.D. Fla. 2017).

Carlwood has not shown a business relationship with Duke under which it had legal rights, that is, an agreement giving rise to legal rights or understanding between Duke and Carlwood that would have been completed if Wesco had not interfered. First, Carlwood has not produced a

written agreement with Duke.[7] The existing blanket purchase order did not impose an obligation on Duke to purchase from Carlwood. As evidenced by Duke's email to Carlwood, Duke was "unable to make a specific volume commitment[] due to the variability of demand for [Carlwood's] products," and its "projections should serve only for planning purposes and not be considered promised or committed revenues." (Dkt. 90-1 at 4). Although a close call, Carlwood's expectations in that regard would have been speculative, at best. And there is no evidence that Wesco disregarded any specific order issued by Duke. Nor has Carlwood refuted Dowell's testimony that it was Duke that deleted the blanket purchase order and ultimately told Wesco that it did not want to be involved with Carlwood.

Second, although Duke may have assured Carlwood that they would continue to do some business together, there was no understanding as to the extent of that future business. Carlwood's expectations in that regard would have been speculative, at best, and did not give rise to legal rights. *St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 505 (Fla. 5th DCA 2001) ("The speculative hope of future business is not sufficient to sustain the tort of interference with a business relationship."); *see also Realauction.com, LLC v. Grant St. Grp., Inc.*, 82 So. 3d 1056, 1060 (Fla. 4th DCA 2011) (same).[8] Accordingly, the undisputed evidence

---

[7] Carlwood further concedes in the parties' Joint Pre-Trial Statement that it "had no written contract or agreement with Progress Energy, Duke Energy, or Wesco during all relevant time periods." (Dkt. 91 at 11).

[8] Notably, although Duke's spending on products supplied by Carlwood declined each year from 2012 to 2015, Duke continued purchasing from Carlwood. (Dkt. 87-2 at 3). According to Duke's records, this included $699,010 in purchases in 2013. (Id).

Based on Penuel's communications with his team in April 2014, Duke's supply chain team had Wesco "on the hook for $450K spend in T&D with Carlwood." (Dkt. 87-7 at 2). Yet as a Duke representative explained to Carlwood in September 2014, Duke was "unable to make a specific volume commitment[] due to the variability of demand for [Carlwood's] products," and its "projections should serve only for planning purposes and not be considered promised or committed revenues." (Dkt. 90-1 at 4). Moreover, as discussed, Dowell's statements at the April 2013 meeting were too vague and indefinite to create an oral agreement between Wesco and Carlwood, much less Carlwood and Duke. *See Bergman*, 826 So. 2d at 503 (Fla. 4th DCA 2002).

does not demonstrate the existence of, or even a material factual dispute of the existence of a business relationship between Duke and Carlwood under which Carlwood had legal rights.

II. Intentional and Unjustified Interference with Carlwood and Duke's Relationship

Moreover, any interference with Carlwood and Duke's business relationship by Wesco was not unjustified because Wesco was not a stranger to that relationship. Under Florida law,

> For the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship. A defendant is not a stranger to a business relationship if the defendant has any beneficial or economic interest in, or control over, that relationship. . . .
>
> [A] defendant is not a stranger to a business relationship, and thus cannot be held liable for tortious interference, when it has a supervisory interest in how the relationship is conducted or a potential financial interest in how a contract is performed.

*Palm Beach Cty. Health Care Dist.*, 13 So. 3d at 1094 (internal citations and quotation marks omitted). Actions taken to safeguard or protect one's financial interests, so long as improper means are not employed, are also privileged. *See Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1321 (11th Cir. 1998).[9]

---

[9] This "privilege to interfere" is qualified where "malice is the sole basis for the interference." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 n.9 (11th Cir. 2001) (citation omitted); *see also Menendez v. Beech Acceptance Corp.*, 521 So. 2d 178, 180 (Fla. 3d DCA 1988) (noting that a defendant's protection of its own financial interest, "even if tinged with animosity and malice, does not give rise to a cause of action for interference with a contractual relationship"). Some courts have also found that whether the defendant acted in a principal's interests is relevant. *See, e.g.*, *O.E. Smith's Sons, Inc. v. George*, 545 So. 2d 298, 300 (Fla. 1st DCA 1989).

Additionally, the privilege does not apply if the defendant used "improper methods" to interfere. *See KMS Restaurant Corp. v. Wendy's Intern., Inc.*, 361 F.3d 1321, 1326-27 (11th Cir. 2004). This includes "physical violence, misrepresentations, intimidation, conspiratorial conduct, illegal conduct, and threats of illegal conduct." *See Ice Portal, Inc. v. VFM Leonardo, Inc.*, No. 09-60230-CIV, 2010 WL 2351463, at *7 (S.D. Fla. June 11, 2010); Florida Standard Jury Instructions in Civil Cases § 408.6 (2018).

Carlwood has not demonstrated that Wesco's sole basis for the claimed interference was malice or that improper methods were used. It further cites no authority finding malice or improper methods in circumstances like those presented here. *See, e.g.*, *Int'l Sales & Serv., Inc.*, 262 F.3d at 1160 (applying competition privilege, which requires that no improper means are employed, to defendant's promise to plaintiff that it would not sell directly to its customers in exchange for their identity, which was subsequently broken).

To illustrate, in *Genet Co. v. Annheuser-Busch, Inc.,* 498 So. 2d 683 (Fla. 3d DCA 1986), the court rejected a tortious interference claim against Annheuser-Busch, Inc., based on its failure to approve the sale of a wholesalership to Genet. Under an equity agreement between Annheuser-Busch and the seller, Annheuser-Busch reserved the right to approve transfer of the wholesalership. 498 So. 2d at 684. The court reasoned that because Annheuser-Busch "had the contractual right . . . to approve or disapprove any proposed transfer," it was not a "disinterested third party to plaintiffs' agreement." *Id.*

This reasoning has been applied in other contexts. For example, in *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334 (S.D. Fla. 2007), summary judgment was granted in favor of a defendant that had engaged an entity to issue a letter of credit to the plaintiff and was thus the "source" of the relationship it was accused of interfering with. 514 F. Supp. 2d at 1338-39. That defendant, as in *Genet*, had a "contractual right to 'interfere.'" *Id.* And in *Astro Tel, Inc. v. Verizon Fla., LLC*, 979 F. Supp. 2d 1284 (M.D. Fla. 2013), the defendant "was responsible for procuring, installing, and maintaining the network for [the plaintiff's] customers," and thus could not "be held liable for tortious interference because [it] has an economic interest in the relationship—[the plaintiff's] business relationships with its customers are contingent upon [the plaintiff's] ability to lease network components from [the defendant] in the first instance." 979 F. Supp. 2d at 1299-30; *see also Palm Beach Cty. Health Care Dist*, 13 So. 3d at 1094 ("Under

---

And in his declaration, Robert Stevens, a senior project manager for Duke, avers that "WESCO did not act against Duke Energy's interest in its dealings with Carlwood Safety, and Wesco acted in Duke Energy's best interest in its dealings with Carlwood Safety." (Dkt. 90-1 ¶ 10). Although this declaration was seemingly prepared in response to Carlwood's opposition, Carlwood did not move to strike or otherwise object to the document. In any event, summary judgment is appropriate without consideration of this declaration.

Finally, Carlwood incorrectly contends that Wesco did not plead that its interference was justified and constituted lawful competition. *See* (Dkt. 3 at 7-8). Even if Wesco did not plead the defense, Carlwood fails to cite authority refusing to consider a privilege to interfere because it was not pleaded. (Dkt. 87 at 15).

the law of tortious interference, [the defendant] is not a 'stranger' to any contract that it will ultimately fund.").

Consistent with this reasoning, Wesco, as Duke's supply integrator, had a financial interest in the Carlwood and Duke relationship. And it had a supervisory interest in and control over how the relationship was conducted.[10] Indeed, Wesco bid on and won the bid to integrate and manage Duke's company-wide supply chain before it knew of Carlwood. (Dkt. 77-1, Dowell Dep. at p. 39). As Dowell explained, Wesco was "managing suppliers that Duke has selected" and "pulling [them] into this integrated supply chain." (Id. at 52). Accordingly, Wesco had obligations to Duke, which approved the suppliers from whom Wesco was authorized to purchase. (Dkt. 77-1, Penuel Dep. at pp. 30-31). And Wesco was further constrained "on the pricing based on what [it was] awarded by Duke for [the] contract, and [it had] a margin that [it was] allowed to charge based on top of the cost for that item." (Id. at 62). Finally, Duke ultimately told Wesco that it would no longer be involved with Carlwood, and Wesco could decide whether it would "try to work with Carlwood." (Dkt. 77-1, Dowell Dep. at p. 97).

The undisputed record evidence therefore demonstrates that Wesco was not a stranger to the Carlwood - Duke relationship and that any interference was justified. Accordingly, summary judgment against Carlwood on its tortious interference with a business relationship claim is appropriate.[11]

---

[10] In his deposition, Boies acknowledged that Wesco had a supervisory interest in the Duke and Carlwood relationship, and a financial interest in at least *its* contract with Duke. (Dkt. 77-1, Boies Dep. at pp. 225-27). Carlwood further concedes in the parties' Joint Pre-Trial Statement that "[a]fter October 2012, Wesco was an interested third-party, not a 'stranger' to business relationships involving Duke Energy, and therefore enjoyed a qualified privilege to interfere in any business relationship involving Duke Energy's supply chain." (Dkt. 91 at 11).

[11] Wesco also contends that the evidence (namely Dowell's and Penuel's depositions) supports a finding that it encouraged the Duke and Carlwood relationship, rather than interfered with it. And there are several indications in the record that Duke's supply chain strategy team and business units did not agree on the extent of Carlwood's

*Merits of the Fraud Claim*

Although Carlwood's fraud claim is not preempted, it is unsupported by the evidence. In its response to the summary judgment motion, Carlwood does not expressly refute Wesco's argument that the fraud claim is unsupported, since "[t]here is no proof of an intentionally false statement on Wesco's part" or that Wesco "misrepresented any material fact or had knowledge of a misrepresentation of a material fact." (Dkt. 77 at 17, 19; Dkt. 87).[12]

Indeed, to succeed on its fraud claim, Carlwood must show: "(1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation." *See Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005) (citations omitted). In short, there is no indication in the record that Wesco made a false statement concerning a specific material fact, which it knew was false, or that Carlwood suffered a resulting injury.

First, Carlwood does not identify a false statement or misrepresentation of a material fact on which it relied. Nor does it identify evidence indicating that Wesco was aware that any material

---

involvement as a supplier. *See, e.g.*, (Dkt. 77-1, Dowell Dep. at pp. 96-97, 104-06; Dkt. 77-1, Penuel Dep. at pp. 62-63, 134; Dkt. 87-7 at 2). Carlwood, on the other hand, points to internal Wesco communications to show that Wesco rejected Carlwood as a supplier, contrary to Duke's wishes.

Because any interference was not unjustified, however, it is unnecessary to resolve this dispute. It is moreover unnecessary to determine whether, as Wesco suggests, the statements from Carlwood's suppliers are inadmissible hearsay, insufficient to preclude summary judgment. (Dkt. 90 at 4); *see Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012).

[12] This failure to respond to Wesco's arguments constitutes abandonment of the fraud claim and is an alternative basis to grant summary judgment in Wesco's favor. *See, e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (holding a non-movant's failure to respond to an issue raised by a movant in a summary judgment motion constitutes abandonment of the claim); *see also McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626 (11th Cir. 2007). Although Carlwood contends that its fraud claim is not preempted (Dkt. 87 at 5), it never expressly or specifically responds to Wesco's argument that the evidence does not support a *prima facie* showing of fraud.

statement was false. Indeed, it has not refuted Wesco's evidence that the RFQ was sent in good faith for Carlwood to meet Duke's pricing and margin requirements. Although Carlwood speculates that the RFQ was sent to obtain its proprietary information, "[g]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment." *Atakora v. Franklin*, 601 F. App'x 764, 766 (11th Cir. 2015).

Second, as for the element of injury, Boies testified that Carlwood's response to the RFQ was constrained by Wesco's price and markup limitations, which were imposed by Duke. In his words, "[Wesco] told us specifically the number. Basically, they could have filled out the RFQ for us, because they were telling us 'Here's what the price has to be.' And so we filled it out exactly how they said, yes." (Dkt. 87-3, Boies Dep. at p. 139). Carlwood's response to the RFQ was more an indication of its willingness to provide supplies at the specified price, rather than a disclosure of confidential pricing information.[13]

Moreover, Carlwood fails to produce evidence to support its allegation that Wesco used the information to undercut its prices and sell to Duke. Even if Wesco decided to supply products to Duke directly, rather than order through Carlwood, it does not necessarily follow that Wesco used any information it obtained from Carlwood to accomplish this. Indeed, it is undisputed that Wesco had an agreement with Duke that included pricing and markup information on supplied items. (Dkt. 77-1, Dowell Dep. at p. 74).

---

[13] To the extent Carlwood was injured by disclosing its vendor information in response to the RFQ, the fraud claim nonetheless fails due to the absence of any misrepresentation intended to induce reliance.

Accordingly, Carlwood has not shown any knowing misrepresentation or resulting injury. Considering the record evidence and the absence of a genuine dispute of material fact, summary judgment is due to be granted against Carlwood on the merits of its fraud claim.[14]

## CONCLUSION

Accordingly, Defendant Wesco Distribution, Inc.'s motion for summary judgment is **GRANTED**. (Dkt. 77). The Clerk is directed to enter judgment in favor of Defendant, terminate any pending motions, and close the file.

**DONE AND ORDERED** this 4th day of March, 2020.

*/s/ James D. Whittemore*
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

---

[14] Carlwood's complaint limits the fraud claim to Wesco's alleged misappropriation of its pricing and other confidential information. (Dkt. 2 ¶¶ 33-34). Although Carlwood does not expressly contend that Wesco's representations during the April 2013 meeting and projections of future business constitute fraud, any such contention is without merit. Under Florida law,

> [a]s a general rule, fraud cannot be predicated on a mere promise not performed. However, under certain circumstances, a promise may be actionable as fraud where it can be shown that the promisor had a specific intent not to perform the promise at the time the promise was made, and the other elements of fraud are established.

*PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 809 n.12 (11th Cir. 2010) (citations omitted). And "there must be a false assertion in regard to some existing matter by which a party is induced." *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1223 (11th Cir. 2018) (emphasis omitted) (rejecting argument that fraud claim is permitted to proceed alongside a breach of contract claim "where the plaintiff alleged that the defendant never intended, from the outset, to comply with the contractual provisions at issue").

It is undisputed that Wesco did not make any pre-contractual representations to Carlwood "expressly affirming that it would comply with the specific contractual provision that it ultimately breached." *Id.* Rather, there never was a contract between Carlwood and Wesco. Finally, there is no evidence to substantiate Carlwood's speculation that, at the time of the meeting, Wesco had a secret intent not to partner with Carlwood. (Dkt. 85 at 20-22); *see Awodiya v. Ross Univ. Sch. of Med.*, 391 F. Supp. 3d 1098, 1108 (S.D. Fla. 2019) (finding assertion of defendant's secret intent not to comply with law insufficient to withstand summary judgment); *Prieto v. Smook, Inc.*, 97 So. 3d 916, 918 (Fla. 4th DCA 2012) (lack of performance insufficient).